**DRAFT**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LIAM PATRICK MCKENNA,** individually and as administrator of the estate of Bailey Francis McKenna, *Plaintiff*, v. **JOSEPH WOLK** *et al.*, *Defendants*. | Civil Action No. 18-cv-3746 |

## MEMORANDUM OPINION

**GOLDBERG, J.**                                                                                          December 29, 2021

  This police use-of-force case arises out of a fatal collision between a dirt bike rider and a police SUV. Plaintiff Liam Patrick McKenna ("Plaintiff"), as administrator of the estate of Bailey Francis McKenna ("McKenna"), brings claims under 42 U.S.C. § 1983 against police officer Joseph Wolk ("Wolk") and the City of Philadelphia ("the City") in connection with a collision that took place on November 14, 2016 in Northeast Philadelphia. Plaintiff asserts a violation of McKenna's right to be free from excessive force and a violation of McKenna's right to due process of law.

  Presently before me is a Motion for Summary Judgment filed on behalf of all Defendants. For the reasons given below, Defendants' Motion will be denied as to Plaintiff's excessive force and due process claims against Wolk and granted as to Plaintiff's claims against the City.

## I.  FACTS

  Taken in the light most favorable to Plaintiff as the party opposing summary judgment, Plaintiff's evidence could establish the following:

**DRAFT**

- On the afternoon of November 14, 2016, McKenna and a group of other individuals were riding off-road dirt bikes around Northeast Philadelphia in the vicinity of Torresdale Avenue and Harbison Avenue. Wolk was on patrol in the area driving a marked Ford Explorer ("the Explorer"). (Plaintiff's Response to Defendants' Statement of Facts ("PR") ¶¶ 12-16.)

- When Wolk spotted the group of dirt bikers, he activated the Explorer's lights and sirens. (PR ¶ 20.) Video recorded by one of the bikers shows Wolk following several bikers in his Explorer while driving in circles around streets and parking lots, at times weaving through traffic. (YouTube Footage, Video Exhibit 1, at 0:00 to 1:00.[1]) At his deposition, Wolk agreed he was attempting to stop the bikers. (Wolk Transcript, Plaintiff's Ex. B, at 152-53.) None of the bikers heeded Wolk's authority.

- At some point, Wolk's pursuit took him northeast on Torresdale Avenue, past the intersection of Torresdale with Howell Street. According to Wolk, he traveled there while following another biker (not McKenna) who nearly struck a bystander on the sidewalk. (Wolk Transcript at 178, 241; Phillips Transcript, Defendants' Ex. D, at 8-12.) Security camera footage shows a biker and Wolk's Explorer traveling northeast on Torresdale Avenue faster than the surrounding traffic, with the Explorer's lights activated. (K&C Video, Video Exhibit 2, at 0:07 to 0:10.) Wolk pursued the biker northeast to Higbee Street before losing sight of him. (Wolk Transcript at 225.) Wolk then reversed course and traveled back down Torresdale Avenue with the Explorer's lights no longer activated. (K&C Video at 1:05-1:15.)

- As Wolk neared the intersection of Torresdale Avenue with Howell Street from the northeast, three bikers (none of them McKenna) approached from the southwest. One biker turned right on Howell Street, one veered onto the sidewalk on Torresdale Avenue, and one continued through the intersection on Torresdale. (K&C Video at 1:05-1:14.) Wolk can then be seen driving the Explorer over the yellow center line of Torresdale Avenue, into oncoming traffic and directly toward the biker who was approaching him. A driver in a sedan appears to stop suddenly to avoid a head-on collision with the Explorer. The sedan also obstructed the path between Wolk and the biker. Wolk stopped, then veered back into his lane and resumed approaching the intersection. The Explorer's lights remained off during this maneuver. (K&C Video at 1:13-1:15.)

- At that point, McKenna approached the intersection from the southwest (opposite Wolk), traveling northeast on Torresdale Avenue. (Aztec Video, Video Exhibit 4, at 4:21-4:23.) A photograph of the intersection shows that McKenna would have been in the bike lane that runs to the right of traffic on Torresdale Avenue. (Kineticorp Report, Plaintiff's Ex. J, Figure 2a.) Plaintiff's expert calculated McKenna's speed from the video footage as 38 miles per hour. (Id. at 14.) It appears from the video that Wolk had a clear line of sight to McKenna.

---

[1] Plaintiff provided the Court with copies of the video footage referenced in the report by Kineticorp, Plaintiff's Exhibit J. Timestamps refer to the video files in "Subpart 3" of the materials.

**DRAFT**

- Moments before McKenna entered the intersection, Wolk made a sharp turn to the left. (Aztec Video at 4:24; K&C Video at 1:16.) Just as the Explorer passed the crosswalk onto Howell Street, McKenna crossed the intersection and collided with the Explorer's front passenger door. (K&C Video at 1:17.) McKenna later died from his injuries.

- From the video footage, it could be inferred that Wolk's left turn was unusually sharp. Rather than drive forward into the intersection as one normally would, Wolk cut through the oncoming lane of Torresdale Avenue toward the sidewalk corner. Then, instead of driving into the right (forward) lane of Howell Street, Wolk's turn ended up in the left (oncoming) lane, right next to the left curb. (K&C Video at 1:16-1:17.) Officer William Lackman, who investigated the crash for the Police Department, described a turn of this nature as characteristic of a drunk driver. (Lackman Transcript, Plaintiff's Ex. D, at 62-63.)

- Plaintiff further offers an expert analysis of Wolk's turn. Based on the video evidence and a data log from the Explorer's Airbag Control Module (ACM), Plaintiff's engineering experts determined that Wolk's leftward acceleration (that is, into McKenna's path) during the turn was roughly four times as fast as a typical left turn and twice as fast as a typical emergency swerve. (Kineticorp Report at 16-17.) The experts also concluded from the ACM data that Wolk lifted his foot from the accelerator and placed it on the brake pedal roughly 0.5 seconds before the crash. (Id., Figure 18.)

- Plaintiff also offers evidence on the practices of the Philadelphia Police Department with respect to vehicle pursuits generally. The Department has a policy, called Directive 9.4, under which vehicle pursuits are only considered "justified" when necessary to prevent death or serious bodily injury, to effect an arrest for a serious crime, or when the suspect is armed. (Plaintiff's Ex. R. at Ex. PPD-3, § 1.B1.) The Directive recognizes that these limits are needed to balance the Department's interest in immediate capture against the risks such pursuits create for public safety. (Id. § 1.A.1.) Nevertheless, in the years leading up to the injury in this case, a majority of vehicle pursuits were found to be "not justified." (Plaintiff's Ex. R. at Ex. PPD-4.) The City's representative conceded that these statistics reflect a "pattern of police misconduct stemming from police engaging in unjustified vehicular pursuits." (Lukach Transcript, Plaintiff's Ex. R., at 103.) Yet despite finding dozens of pursuits each year to be unjustified, in the five years preceding the injury the Department sustained only six findings that officers violated Directive 9.4. (Plaintiff's Ex. U.)

Based on the above facts, Plaintiff brings claims against Wolk under 42 U.S.C. § 1983 for violation of McKenna's Fourth Amendment right to be free from unreasonable seizures and his Fourteenth Amendment due process right to be free from government action so egregious that it shocks the conscience. Plaintiff contends Wolk deliberately caused the collision and that this was a seizure conducted with excessive force, or, alternatively, that it shocked the conscience because

**DRAFT**

it was committed with an intent to harm McKenna. Plaintiff further claims the City is liable because Wolk's actions were the result of the City's custom of permitting unreasonable vehicle pursuits.

Wolk offers a starkly different view of how the crash occurred. According to Wolk, once he lost sight of the biker near Higbee Street, he decided to abandon pursuit and go to lunch. (Wolk Transcript at 164, 243-44.) As Wolk approached the intersection of Torresdale and Howell and saw three bikers approaching from the opposite direction, he denies any intent to pursue them. Rather, Wolk speculates he must have accidentally drifted over the center line while his eyes were on the approaching bikers. (Wolk Transcript at 126-30.) And Wolk testified he turned left on Howell Street because he was on his way to Old English Pizza to get something to eat. Wolk denies he even saw McKenna before the collision. (Wolk Transcript at 164-65, 183, 252.)

## II.     LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

**DRAFT**

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

### III. ANALYSIS

42 U.S.C. § 1983 "provides a remedy for the violation of rights created by federal law." Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). To make out a claim under § 1983, a plaintiff must demonstrate: "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." Id. Defendants do not contest that Wolk acted under color of state law. (Defendant's Brief at n.1.) I therefore analyze whether a jury could find that Wolk deprived McKenna of a federal right.

In addition, I must analyze whether Wolk is entitled to qualified immunity. A defendant is not liable under § 1983 unless the defendant "violated a … right that was 'clearly established' at the time of the challenged conduct." Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014). "In other

words, existing precedent must have placed" it "beyond debate" that the defendant's conduct was unlawful. See id. at 779.

The Supreme Court "ha[s] repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Id. Thus, "[i]t is only when both the theory of liability and its application to the established facts are sufficiently plain that the legal question of liability is beyond legitimate debate and a plaintiff can defeat a qualified immunity defense." Sauers v. Borough of Nesquehoning, 905 F.3d 711, 719 (3d Cir. 2018). In particular, a "general" rule that deadly force may only be used to meet a threat of physical harm cannot defeat qualified immunity in the absence of factually similar precedent. Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam).

"[I]n reviewing a motion for summary judgment on the basis of qualified immunity, normal principles of summary judgment … apply, and any disputes of fact must be resolved in favor of the plaintiff." Est. of Smith v. Marasco, 430 F.3d 140, 148 n.3 (3d Cir. 2005). Accordingly, I must analyze whether, taking the facts in the light most favorable to Plaintiff, and the law as it was clearly established at the time of the alleged wrongdoing, a reasonable jury could find that Wolk violated McKenna's constitutional rights. See id.

### A.    Excessive Force

Plaintiff first asserts that Wolk deprived McKenna of his Fourth Amendment right to be free from seizures that are "unreasonable" due to the use of excessive force. To succeed on this claim, Plaintiff must show that a seizure occurred and that the level of force was unreasonable. Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999).

**DRAFT**

    1.    <u>Seizure</u>

A "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 844 (1998) (emphasis deleted); <u>see also</u> <u>Torres v. Madrid</u>, 141 S. Ct. 989, 999 (2021) (finding shooting a fleeing suspect to be a seizure). Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude Wolk "seized" McKenna by intentionally causing McKenna to collide with the Explorer.

First, video evidence shows Wolk initiating a fast and sharp left turn immediately before McKenna approached the intersection and while Wolk had a direct line of sight to McKenna. The apparent nature of the turn—accelerating quickly, crossing the center line of Torresdale, and ending up facing oncoming traffic on Howell—could raise an inference that Wolk was not, as he claims, going to lunch. Rather, a jury could view Wolk's turn as a reaction to McKenna's imminent approach. Likewise, a jury could view it as significant that Wolk moved his foot from the accelerator to the brake just as the Explorer was directly obstructing McKenna's path.

Second, just moments before the fatal left turn, Wolk can be seen on video apparently attempting to drive into the path of a different biker. Wolk's leftward swerve took him across the center line and could have resulted in a collision with the biker had an unrelated sedan not obstructed his course. A jury could infer from this action that it was no coincidence Wolk's second leftward swerve began just as another biker—McKenna—came into view.

Defendants offer several points in response that at most create factual questions. Defendants note that Wolk stayed under the speed limit without accelerating or decelerating in the seconds before the collision and that McKenna veered to the right as he approached the sidewalk at Torresdale and Howell. Defendants place particular emphasis on their view of the video evidence that McKenna would have avoided the collision had he continued straight across the

intersection. Having reviewed the video, I cannot say that there is no factual dispute regarding whether McKenna's turn to the right was the sole cause of the collision. A jury will have to weigh the strength of this evidence.

Based on the foregoing, I find Plaintiff has pointed to sufficient facts such that a jury could conclude a seizure occurred.

2. Excessive Force

Plaintiff must next show Wolk's seizure was "unreasonable" in that the force used was excessive. Abraham, 183 F.3d at 288. In addition, for Plaintiff to overcome Wolk's qualified immunity defense, clearly established law at the time of the alleged constitutional wrong must have put the excessiveness of the force used "beyond debate." Mullenix, 577 U.S. at 12.

The Fourth Amendment prohibits a police officer from using excessive force to effectuate an arrest. Graham v. Connor, 490 U.S. 386, 394 (1989). Determining whether force is excessive is a fact-sensitive inquiry that requires balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396. The Third Circuit analyzes the appropriate level of force through the "Sharrar factors," which include, among other considerations, the severity of the crime for which the officer is conducting an arrest and the danger the arrestee may pose to the officer and others. Sharrar v. Felsing, 128 F.3d 810, 821-22 (3d Cir. 1997).

Two sources of clearly established law are relevant in deciding whether Wolk's force was excessive and whether this conclusion was "beyond debate" at the time the conduct occurred. The first is the Sharrar standard itself. See Est. of Smith, 430 F.3d at 150. "A reasonable officer would be guided by the Sharrar factors in determining whether to use overwhelming force in a given situation. Thus, if an officer applies the Sharrar analysis in an unreasonable manner, he is not entitled to qualified immunity." Id. For example, an officer who used his police vehicle to strike a

suspect on a motorcycle during an off-road pursuit along the railroad tracks was not entitled to qualified immunity because there was no danger to the officer or others that could have justified the officer in believing such violent force was necessary. O'Donnell v. Tinicum Twp., 110 F. Supp. 3d 571, 578-79 (E.D. Pa. 2015).

The second source of clearly established law is the Third Circuit's decision in Abraham. There, an officer used excessive force when she fired on a suspect driving away at low speed in a mall parking lot. 183 F.3d at 293-96. Viewing the facts in the light most favorable to the plaintiff, the court found that a jury could conclude the suspect posed no threat to the officer or others sufficient to justify the use of deadly force. Id.

On the other side are cases in which the Supreme Court has approved the use of deadly force to end high-speed car chases. In Plumhoff, it was reasonable for an officer to fire on a fleeing suspect to end a 100-mph chase that had already involved multiple collisions, due to the "deadly threat" such a chase posed to others on the road. 572 U.S. at 776-77. Similarly, in Scott v. Harris, 550 U.S. 372 (2007), it was reasonable for an officer to end an 85-mph, "frightening" chase on the highway in the "dead of night" by hitting the fleeing individual's car. Id. at 379-81. The chase had already involved one collision between the fleeing individual and the officer. Id. at 1773. Finally, in Mullenix, officers were entitled to qualified immunity when they shot a fleeing suspect who was driving 85-110 mph on the highway and had threatened, via telephone, to shoot officers if they did not abandon pursuit. 577 U.S. at 14-15. The Court there noted that it "has … never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity," leaving no clearly established rule for the officers to follow. Id. at 15. Critically, these high-speed chases all involved "a higher level of danger []to officers and the public" than was present in Abraham. See Zion v. Nassan, 556 F.

App'x 103, 109 (3d Cir. 2014). Accordingly, Abraham remains the governing law in cases where the heightened danger of a high-speed car chase is lacking. Id.

Here, viewing the evidence in the light most favorable to Plaintiff, Wolk is not entitled to qualified immunity because it was clearly established at the time of the alleged wrongdoing that striking a dirt bike rider with an SUV to address a traffic infraction was excessive. Crashing an SUV into an exposed biker traveling at 38 mph was obviously deadly, and a jury could reject the notion that any danger to Wolk or others justified such a lethal maneuver. McKenna was unarmed, had committed no violent or serious crime, and had made no threats. He was driving a small, lightweight vehicle at 8 mph over the speed limit in the bike lane to the right of traffic. McKenna was not even fleeing at the time of the alleged seizure. Any comparison to the dangerous car chases in Plumhoff, Scott, or Mullenix is simply too remote to have justified Wolk in believing deadly force could be appropriate in circumstances such as these.

Rather, assuming Plaintiff's view of Wolk's conduct to be true, it is governed by Sharrar and Abraham. There was no serious crime, no threats, no weapons, no danger to Wolk, and no significant danger to the public, yet Wolk responded with an attack that was almost certain to cause death or serious bodily injury. Because "all of the [Sharrar] factors applicable here militated strongly against the level of force used by" Wolk, "[h]e could not reasonably have believed his conduct was permissible under the existing precedent." O'Donnell, 110 F. Supp. 3d at 579.

Defendants make much of the fact that a different biker, not McKenna, nearly struck a pedestrian on the sidewalk. While this incident may have justified Wolk in pursuing the wrongdoer, a jury could find it did not give Wolk a reason to crash his police vehicle into any other bikers he happened to encounter that day. There are, at least, "many genuine factual disputes about

how much of a threat [McKenna] posed to others through [his] conduct," thus precluding summary judgment. Abraham, 183 F.3d at 291.

I therefore find that a reasonable jury could conclude Wolk's force was excessive under the clearly established law at the time of the alleged wrongdoing. I will therefore deny summary judgment as to Plaintiff's excessive force claim against Wolk.

### B. Substantive Due Process

Plaintiff next claims Wolk violated McKenna's right under the Fourteenth Amendment's Due Process Clause to be free from "abuse[s] of power … that … shock[] the conscience." County of Sacramento, 523 U.S. at 846. Both sides agree that, under the clearly established law at the time of the alleged wrongdoing, the question is whether a jury could find Wolk acted with an "intent to harm" McKenna. Id. at 854.

It should be noted that, to the extent Wolk "seized" McKenna, there would be no separate claim for violation of McKenna's due process rights because "an independent substantive due process analysis of an excessive force claim is inappropriate where … the plaintiff's claim is covered by the Fourth Amendment." Davenport v. Borough of Homestead, 870 F.3d 273, 279 (3d Cir. 2017). Nevertheless, not every intentional contact amounts to a seizure; the latter must also involve an intent to restrain. Torres, 141 S. Ct. at 998. Therefore, to the extent a jury could find Wolk intended to harm McKenna but did not seize him, Plaintiff's due process claim should be allowed to proceed.

For the reasons explained above, a jury could conclude Wolk intentionally swerved his police vehicle into McKenna's path with the intent of causing a collision. Because McKenna was exposed, vulnerable, and traveling at high speed, it could be inferred Wolk did so intending to harm McKenna. And, if the jury doubted Wolk meant to restrain McKenna (particularly given that Wolk himself denies making the turn for any law enforcement purpose), there would be no seizure.

**DRAFT**

I will therefore deny summary judgment as to Plaintiff's due process claim against Wolk.

**C.    Municipal Liability**

Plaintiff additionally seeks to hold the City liable for Wolk's allegedly unconstitutional conduct.

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). "A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." Id. (alterations and quotation marks omitted). "Custom … may also be established by evidence of knowledge and acquiescence." Id. In particular, "[i]nadequate police training—or the absence of training altogether—may be the basis for a § 1983 suit if the deficient training amounts to 'deliberate indifference' to the rights of the person aggrieved." Bellmon v. City of Philadelphia, 895 F. Supp. 2d 659, 663 (E.D. Pa. 2012).

Plaintiff has presented sufficient evidence for a jury to infer the City has a "custom" of permitting officers to engage in vehicular pursuits without adequate consideration for public safety. The evidence could further suggest the City inadequately trains its officers in the use of pursuits, and that this inadequacy shows deliberate indifference to the ongoing pattern of violations of the Police Department's internal policies.

However, it takes more than a pursuit being unjustified to violate the Constitution; there must be an unreasonable use of force or a conscience-shocking disregard for public safety. Graham, 490 U.S. at 394; Sauers, 905 F.3d at 717. There is a significant difference between the alleged custom of engaging in vehicular pursuits under imprudent circumstances, and the alleged wrongdoing of causing an exposed dirt bike to crash into an SUV. Plaintiff has not sufficiently

**DRAFT**

pointed to a custom of such violent conduct. Nor can it be said Wolk was "implement[ing] or execut[ing]" a custom of vehicular pursuit by allegedly striking McKenna with his vehicle. Beck, 89 F.3d at 971.

I will therefore grant summary judgment to the City on Plaintiff's claims against it.

**IV.     CONCLUSION**

For the reasons given, I find that Plaintiff may proceed to a jury with his excessive force and due process claims against Wolk but that Plaintiff's claims against the City should be dismissed.

An appropriate order follows.